UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TARA M. BURGE,

    Plaintiff,

v.                              Case No. 8:24-cv-2955-VMC-CPT

RICK WELLS,
Official Capacity as Sheriff
of Manatee County, Florida,

    Defendant.
_____/

**ORDER**

This matter comes before the Court upon consideration of Defendant Sheriff Rick Wells's Motion for Summary Judgment (Doc. # 33), filed on September 24, 2025. Plaintiff Tara M. Burge responded on October 30, 2025. (Doc. # 42). Sheriff Wells replied on November 13, 2025. (Doc. # 48). For the reasons that follow, the Motion is granted.

**I.**   **Background**

    **A.**   **Parties and MCSO Policies**

Sheriff Rick Wells is the chief law enforcement officer of Manatee County, Florida. (Doc. # 34 at ¶ 3). Sheriff Wells first took office on January 3, 2017. (Id.).

Ms. Burge is a former deputy sheriff who was employed with the Manatee County Sheriff's Office ("MCSO") from August 2013 until she resigned effective December 7, 2022. (Doc. #

1

35 at 49:15-17; Doc. # 35-4 at 1; Doc. # 35-13). Ms. Burge avers that her resignation was involuntary and, thus, constituted a termination. (Doc. # 45-1 at ¶ 3).

Ms. Burge was hired as a corrections academy recruit under former Sheriff Brad Steube. (Doc. # 35 at 49:15-23; Doc. # 35-4 at 1-2). Eventually, under Sheriff Wells, Ms. Burge became a road patrol deputy in 2017. (Doc. # 35 at 55:15-56:18). In April 2022, Ms. Burge became a detective within the MCSO's Child Protective Investigations Division. (Id. at 58:25-60:21; Doc. # 35-4 at 14; Doc. # 45-1 at ¶ 5).

At the time of her hire, Ms. Burge agreed to "fully comply with all of the rules and regulations of" the MCSO and to "conduct [her] private affairs so as not to bring embarrassment or discredit to [her]self or the" MCSO. (Doc. # 35 at 63:1-19, 65:7-17; Doc. # 35-5). Ms. Burge understood that non-compliance with these conditions could result in termination. (Doc. # 35-5). Ms. Burge maintains that she did not "violate[] any conditions or engage[] in conduct that violated any rules or regulations of MCSO." (Doc. # 45-1 at ¶ 6).

General order ("GO") 1013 is the MCSO's discipline order and was part of Ms. Burge's new-hire orientation. (Doc. # 35 at 63:20-64:24; Doc. # 35-6). It sets forth the standards of

conduct and grounds for discipline applicable to all agency members. Under "conduct unbecoming" violations, GO 1013 confirms that MCSO employees, with exceptions for immediate family members, "shall not associate or have contact with any person whom they know or reasonably should know are convicted felons, or who are under criminal investigation, indictment or sentence for a felony offense, or who are incarcerated in any local, state, or federal correctional facility." (Doc. # 34 at ¶ 5; Doc. # 34-1 at § 12.1.38). Violation of this policy subjects the member to a minimum five-day suspension up to termination. (Doc. # 34-1 at § 12.1.38).

Under "neglect of duty" offenses, GO 1013 precludes (1) the unauthorized access of any National Crime Information Center or Florida Crime Information Center ("NCIC/FCIC") system, including Driver and Vehicle Information Database (D.A.V.I.D.) or Electronic License and Vehicle Information System (E.L.V.I.S.), (2) disclosure of such information to unauthorized individuals, or (3) violation of FCIC/NCIC rules, regulations, or procedures. (Doc. # 34 at ¶ 5; Doc. # 34-1 at § 12.3.38). Engaging in such conduct is a policy violation that results in discipline up to termination. (Doc. # 34-1 at § 12.3.38).

GO 1013 concludes with the MCSO's career service appeals process. (Doc. # 34 at ¶ 6; Doc. # 34-1 at 31-39). This process, in relevant part, permits any full-time employee with more than one year of continuous service to appeal disciplinary actions before a five-member career service appeal board ("CSAB"). (Doc. # 34 at ¶ 6; Doc. # 34-1 at 33-39).

The CSAB is comprised of two members selected by the Sheriff, two members selected by the employee filing the appeal, and a fifth "chairperson" selected by the remaining four members. (Doc. # 34 at ¶ 6; Doc. # 34-1 at § 17.7.1). The CSAB resolves the appeal after a de novo hearing wherein the employee may introduce evidence, question/cross-examine witnesses, and make closing arguments. (Doc. # 34 at ¶ 6; Doc. # 34-1 at § 17.12). The CSAB's decision is final and binding on both the employee and the Sheriff. (Doc. # 34 at ¶ 6; Doc. # 34-1 at 39, § 17.12.18). However, the CSAB's decision is subject to further appeal to a state circuit court in accordance with Florida Rule of Appellate Procedure 9.030. Fla. R. App. P. 9.030(c)(3).

Since 2004, three employees have had their discipline reduced via the career service process, including one overturned termination. (Doc. # 34 at ¶ 7). Ms. Burge

4

acknowledges that the previous statement is "technically accurate." (Doc. # 45-1 at ¶ 13). But she avers that "[s]ince [Sheriff Wells] assumed office, no employee has had a termination overturned or discipline reduced through the CSAB process." (Id.). Based on this, Ms. Burge avers that "the CSAB process is neither independent nor impartial but instead operates to rubber-stamp the Sheriff's disciplinary decisions." (Id.). Although she did not go through the CSAB process herself or ever serve on a CSAB panel, Ms. Burge avers that the "neutral chairperson" fifth member of the board "is an MCSO employee who understands that siding against the Sheriff would constitute career suicide and would be reputationally damaging" such that the "result is a predictably one-sided process where the Sheriff's decision is never overturned." (Id. at ¶ 10). She further asserts that the "theoretical right to further appeal under Rule 9.030 offers no realistic avenue of relief for employees, as such appeals are limited to narrow procedural issues and do not provide for a full or impartial reconsideration of the facts or fairness of the Sheriff's actions." (Id. at ¶ 12).

### B.    **Complaint against Ms. Burge and Investigation**

On November 15, 2022, Manatee County resident Tiffany Porcelli contacted the MCSO of her own accord and complained

that Ms. Burge, who is white, was in an ongoing relationship with her boyfriend and known convicted felon, Thomas Bradshaw, who is Black. (Doc. # 35 at 44:15-20, 88:22-24; Doc. # 36 at ¶ 3; Doc. # 36-1 at 6). Ms. Porcelli also alleged that Ms. Burge had provided Mr. Bradshaw with confidential law enforcement information. (Doc. # 35 at 44:15-20; Doc. # 36 at ¶ 3; Doc. # 36-1 at 6).

The same day as Ms. Porcelli's complaint, the MCSO responded to a domestic disturbance call at Ms. Porcelli's residence. (Doc. # 36-1 at 6). Among other things, Ms. Porcelli repeated her allegations to responding deputies who then relayed the information to the MCSO's Professional Standards Unit. (Id.).

The MCSO subsequently opened an internal investigation into Ms. Porcelli's complaint. (Doc. # 34 at ¶¶ 8-9; Doc. # 36 at ¶ 4). Ms. Burge acknowledges the MCSO was obligated to investigate Ms. Porcelli's allegations and is not challenging the initiation of the investigation as part of her claims. (Doc. # 35 at 44:21-45:3). Ms. Burge, however, avers that Ms. Porcelli's claims were false. (Doc. # 45-1 at ¶ 14).

The MCSO's investigation confirmed Ms. Burge exchanged over 2,500 messages, mostly through Facebook, and ten-plus hours of phone calls/video chats with Mr. Bradshaw over an

6

approximately 14-month period. (Doc. # 36 at ¶ 6). Ms. Burge emphasizes that many of "the calls and video calls included [Mr. Bradshaw's] minor child and/or [the mother of the child]" and that "the majority of communications were for the sole purpose of picking up and dropping of the minor child who [she] was a mentor to." (Doc. # 45-1 at ¶ 17).

The correspondence between Ms. Burge and Mr. Bradshaw included topics such as (1) Ms. Burge's desire to meet the mother of Mr. Bradshaw's children and develop a relationship with his children; (2) Ms. Burge becoming the godmother of one of Mr. Bradshaw's children and (3) Ms. Burge encouraging Mr. Bradshaw to leave Ms. Porcelli, referring to Ms. Porcelli as a "terrible person," and other things. (Doc. # 36-5 at 2-9). Ms. Burge avers that the "purpose of these communications was entirely focused on assisting [Mr. Bradshaw's] family." (Doc. # 45-1 at ¶ 18). Her "intent was to preserve the family unit and ensure the children's stability." (Id.).

Yet, at times, the Facebook communications between Ms. Burge and Mr. Bradshaw appear romantic in nature. After Mr. Bradshaw expressed a desire to "make love" to Ms. Burge, Ms. Burge stated: "There is enough chemistry between us and love and support for each other, that we both know [sex] would be magical! Easily!!" (Doc. # 36-6 at 37). On another occasion,

Ms. Burge commented "Every time I see you . . . Or hugged you . . . Or been around you . . . That dick is rock hard." (Id. at 33). When Mr. Bradshaw explained that was because he was attracted to her, Ms. Burge responded with heart-eyed emojis. (Id.). In another message, Mr. Bradshaw referred to an occasion when Ms. Burge had her "tongue in [his] mouth." See (Id. at 31) (after Ms. Burge stated she was on "#teamashley," meaning she supported Mr. Bradshaw's relationship with the mother of his children rather than with Ms. Porcelli, Mr. Bradshaw responded "Was you team Ashley with your tongue in my mouth . . .").

Ms. Burge avers that these communications are taken out of context. According to her, "[t]he few playful responses on [her] part, were limited, context-dependent, and intended only to defuse and reject unwanted romantic advances without escalating conflict or hurting feelings." (Doc. # 45-1 at ¶ 19). Ms. Burge's "interactions [with Mr. Bradshaw] have always been consistent with [her] ongoing efforts to maintain the family unit and provide guidance to [Mr.] Bradshaw regarding his children and responsibilities." (Id.). She insists that Mr. Bradshaw's statement that she had her tongue in his mouth was a reference "to a dream he had, not an actual event." (Id. at ¶ 20).

During an interview, Mr. Bradshaw advised MCSO investigators that he had kissed Ms. Burge "numerous times" and while they had not had sex, they had touched each other in a sexual manner above their clothes. (Doc. # 36-3 at 7:12–9:21). Ms. Burge avers that Mr. Bradshaw's statement was false, "unreliable," and "must be viewed in light of his clear motive to retaliate against" her. (Doc. # 45-1 at ¶ 20). Although Ms. Burge denies kissing or touching Mr. Bradshaw, she does not dispute the authenticity of her messages with Mr. Bradshaw. (Doc. # 35 at 46:1-12; Doc. # 35-10 at 18:17-35).

The MCSO also discovered six separate occasions where Ms. Burge accessed law enforcement databases to query specific information about Mr. Bradshaw, Ms. Porcelli, and the mother of Mr. Bradshaw's children. The MCSO investigators aver these queries were made with no ascertainable law enforcement purpose and conclude Ms. Burge "engaged in a pattern of FCIC/NCIC misuse." (Doc. # 36 at ¶ 10; Doc. # 36-1 at 7-13, 35-38). The investigation report states that "at the times [Ms.] Burge performed the queries, no related calls for service involving the queried individual was taking place." (Doc. # 36-1 at 37). "[A]t one time, [Ms.] Burge was not working when the queries were conducted." (Id.).

Mr. Bradshaw told investigators that he would sometimes ask Ms. Burge to look up his license plate for his car to "see if the plate's coming back to [him] or not," and Ms. Burge would. (Doc. # 36-3 at 11). Likewise, in a recorded jail call, Mr. Bradshaw told his girlfriend that he called Ms. Burge while he was driving and being followed by a MCSO patrol vehicle, which subsequently pulled him over and resulted in his arrest on an outstanding warrant. (Doc. # 36-1 at 13). He said that during his call to Ms. Burge while he was driving, he inquired if there was a warrant for his arrest and Ms. Burge searched and incorrectly said there was no warrant. (Id.). During this same traffic stop, Ms. Burge appeared at the scene to speak to the deputy who had pulled over Mr. Bradshaw. As investigator Lieutenant Benjamin Main wrote, "[o]nce on scene, [Ms.] Burge questioned the validity of the stop, challenging Deputy Merrill's detainment, advocating for [Mr.] Bradshaw and undermining Deputy Merrill." (Id. at 36); see also (Id. at 23) (synopsis of Deputy Merrill's interview in which he stated he was "perplexed" when Ms. Burge responded to the traffic stop because the stop was "in East Sector and [Ms.] Burge worked West Sector" and reporting that Ms. Burge "question[ed] the reason for the stop and the validity behind it," and

concluding that "Obviously she got involved cause [Mr. Bradshaw] called her").

Ms. Burge disputes that she misused databases, averring that "[e]ach query had a legitimate explanation and lawful purpose." (Doc. # 45-1 at ¶ 22). "[N]one [of the queries] violated Criminal Justice Information Services [] policy or the [Florida Administrative Code ('FAC')]." (Id.). Mr. Bradshaw "had asked [her] to check whether his driver's license was suspended and whether his license plates were properly assigned to his vehicles." (Id.). According to Ms. Burge, she "never acted with 'bad intent,' and none of the criteria for misconduct under FAC R. 11B-27.0011(4)(a–e) apply." (Id.).

On December 5, 2022, Ms. Burge, represented by Bill Lawless with the Fraternal Order of Police, appeared for her interview with MCSO investigators. (Doc. # 37 at 14:3-23). Upon arrival, MCSO Professional Standards Captain Brian Schnering met with Mr. Lawless individually to discuss the process, the allegations against Ms. Burge, and the evidence that had been gathered to date. (Doc. # 34 at ¶ 11; Doc. # 37 at 15:4-16:7). Mr. Lawless testified that, during this discussion, Capt. Scherning advised Mr. Lawless that if the allegations were sustained, "termination was on the table."

11

(Doc. # 37 at 15:10-18, 16:13-18). Mr. Lawless testified that Capt. Schnering never told him that the decision to terminate Ms. Burge had already been made. (Doc. # 37 at 16:19-17:2). In contrast, Ms. Burge avers that Mr. Lawless told her not to undergo the interview because Capt. Schnering had told Mr. Lawless that "the Sheriff's Office had already made the decision to terminate [her]." (Doc. # 45-1 at ¶ 24).

After Capt. Schnering and Mr. Lawless's meeting, Ms. Burge and Mr. Lawless were afforded the opportunity to review the complete investigative file. (Doc. # 37 at 18:2-10). After reviewing the file and based on his review of the evidence, Mr. Lawless advised Ms. Burge: "Well, I'm not going to sugarcoat anything for you, but this looks kind of bad." (Doc. # 35 at 142:15-16; Doc. # 37 at 18:11-22). Ms. Burge was confused by Mr. Lawless's opinion. (Doc. # 45-1 at ¶ 24). "After [they] looked at the investigative file, [Ms. Burge] was happy and confident that [she] was going to be back at work the following day" because "it was clear and obvious that [her] 'relationship' with [Mr.] Bradshaw was wholly in support of his relationship with [the mother of his children]" and that Ms. Burge "had not provided [Mr.] Bradshaw or anyone else with anyone's information, but their own, upon their request." (Id.). Mr. "Lawless explained that when he was in

the meeting with [Capt.] Schnering, [Capt.] Schnering told him that they were terminating [Ms. Burge] for [her] 'ongoing conversation' with [Mr.] Bradshaw, who [she] knew to be a convicted felon. [Mr.] Lawless further explained that the Sheriff's Office had already made the decision to terminate [her]." (Id.).

Initially, Mr. Lawless advised Ms. Burge not to proceed with the interview. (Id. at ¶¶ 24-25; Doc. # 37 at 21:9-20). Before she engaged in the interview with MCSO investigators, Ms. Burge and Mr. Lawless returned to Capt. Schnering's office. (Doc. # 45-1 at ¶ 25). "When [they] arrived in [Capt.] Schnering's office, he had [Ms. Burge's] vacation accruals written down on a post it note." (Id.). Capt. Schnering told Ms. Burge, who was "hysterical," that "if [she] 'forced' them to fire [her], [Ms. Burge] would be considered not leaving in good standing, and [she] would lose [her] retirement and vacation accruals." (Id.). But "if [she] resigned, [her] retirement would not be affected, [Capt. Schnering] would not fight an unemployment claim, and [Ms. Burge] could keep [her] vacation accruals." (Id.). Ms. Burge told Capt. Schnering that "the only reason they were terminating [her] was because [Mr.] Bradshaw is [B]lack, and if he had been a white man, whose family [she] was trying to help, whose little boy [she]

was trying to mentor, and whom [she] had invited to church a thousand times, they would not be firing [her]." (Id.).

After leaving Capt. Schnering's office, Ms. Burge underwent the interview with investigators. During the interview, Ms. Burge explained that she first met Mr. Bradshaw when he was an inmate, and she worked as a correctional officer. (Doc. # 35 at 95:15-22; Doc. # 35-10 at 6:20-25). Ms. Burge said that "obviously [she] knew [Mr. Bradshaw] was a felon this whole entire time" and "he's always obviously been in love with [her]." (Doc. # 35-10 at 6:27-28, 8:1-2). Ms. Burge admitted she met with Mr. Bradshaw on several occasions, both on and off duty. (Doc. # 35-10 at 8:17–9:23). Ms. Burge explained their on-duty meetings, saying "I was just sitting there doing nothing." (Id. at 9:8-10).

Ms. Burge emphasizes that her comments during the interview were not an admission of misconduct. (Doc. # 45-1 at ¶¶ 26-28). According to Ms. Burge, the "full context of [their] communications prove that [she] maintained professional boundaries and never engaged in a romantic or inappropriate relationship, but rather attempted to support and mentor [Mr.] Bradshaw in turning his life around, for the sake of [the mother of Mr. Bradshaw's children] and his children." (Id. at ¶ 26). As for their on-duty meetings, Ms.

14

Burge's comment about doing nothing "referred to being in [her] assigned patrol zone, where members of the public, including [Mr.] Bradshaw, any other formerly incarcerated individuals, family, friends, and community members, were free to approach [her] vehicle." (Id. at ¶ 27). "Regarding off-duty contact, [Ms. Burge] testified that it was limited in nature, and involved brief exchanges related to the pickup or drop-off of [Mr.] Bradshaw's child." (Id.).

Ms. Burge conceded that she and Mr. Bradshaw also exchanged phone calls and text messages. (Doc. # 35-10 at 9:25-10:1, 10:23-30). She avers that "most of [her and Mr. Bradshaw's] communications involved coordination of the pickup or drop-off of his child, or group conversations and video calls that included [the mother of the child] and/or their son." (Doc. # 45-1 at ¶ 28). Mr. Bradshaw did not retain copies of the text messages. (Doc. # 36 at ¶ 7; Doc. # 36-1 at 17; Doc. # 36-4 at 5:9-34). Lt. Main declared that Ms. Burge declined to give the MCSO investigators access to her cell phone to download her text messages with Mr. Bradshaw. (Doc. # 36 at ¶ 7; Doc. # 36-1 at 17). Ms. Burge acknowledges that she "declined" a "forensic data extraction of [her] cell phone." (Doc. # 45-1 at ¶ 28). But Ms. Burge avers that she "gave authorization and offered full access to review any

15

relevant communications in [her] presence, and even allowed investigators to view photographs on [her] phone during the interview." (Id.).

Less than an hour into the interview and before the MCSO had the opportunity to question Ms. Burge about her use of law enforcement databases, a pause in the interview was requested by Mr. Lawless. (Doc. # 35-10 at 29:39-30:9; Doc. # 36 at ¶ 14). Ms. Burge declares that, during this break, Mr. Lawless told her "that [she] had already expressed everything [she] told him [she] wanted to say, and [the MCSO's] decision to terminate was final." (Doc. # 45-1 at ¶ 30). Then, Ms. Burge (through Mr. Lawless) requested to terminate the interview. (Doc. # 35-10 at 31:4; Doc. # 36 at ¶ 14; Doc. # 37 at 23:18-24:14). According to Ms. Burge, "[t]he interview ended based on the futility of continuing a process whose outcome had already been determined, not from any lack of cooperation on [her] part." (Doc. # 45-1 at ¶ 30).

After pausing the interview, Mr. Lawless met with Capt. Schnering to request that the interview be postponed. (Doc. # 37 at 24:3-19). Mr. Lawless testified the purpose of the pause was to allow Ms. Burge, who was "so emotional," to calm down and have time "to consider all her options." (Id.). Ms.

Burge avers that the interview was paused not so should could consider her options but rather because of "the futility of continuing the interview," her visible distress, and the fact that "the interview was being conducted late in the day, in direct violation of the rights afforded to [her] under Florida Statutes § 112, the Law Enforcement Officers' Bill of Rights." (Doc. # 45-1 at ¶ 31).

According to Mr. Lawless, Capt. Schnering gave Ms. Burge until the following day at noon to decide. (Doc. # 37 at 24:20-23). Mr. Lawless understood the options for Ms. Burge would be to either resign with a leave payout and the MCSO's promise not to oppose any claim for unemployment or continue with the interview and risk the outcome of the investigation's conclusion. (Id. at 27:18-28:3). Mr. Lawless considered this pause an acceptable solution. (Id. at 24:24-25:1). Ms. Burge did not consider this pause for her to decide acceptable. Ms. Burge's choice between the two options "was not freely made, it was rushed, [she] was without counsel, [she] was distraught, and it was presented in a manner that conveyed resignation as the only path to preserve the retirement benefits [she] had earned over nearly a decade of service." (Doc. # 45-1 at ¶ 32).

Mr. Lawless then met with Ms. Burge after the interview ended and his conversation with Capt. Schnering. He testified that he reiterated to Ms. Burge that "it didn't look good" and that she faced termination if the violations were sustained. (Doc. # 37 at 25:19-22). In contrast, Ms. Burge declares that, during this conversation, Mr. Lawless told her "that [her] termination was inevitable, regardless of whether or not [she] completed the interview." (Doc. # 45-1 at ¶ 33). Mr. Lawless told her that, if she were terminated, her "only recourse would be an appeal to the CSAB, a process he described as offering no prospect of success due to its consistent alignment with agency decisions." (Id.).

When Ms. Burge did not contact Capt. Scherning by noon the following day, Capt. Schnering called Mr. Lawless for an update. (Doc. # 37 at 28:22–29:16). Capt. Schnering was professional during the call and simply asked Mr. Lawless about Ms. Burge's intentions. (Id.). After speaking with Capt. Scherning, Mr. Lawless called Ms. Burge and encouraged her to contact Capt. Schnering with her decision. (Id. at 29:2–31:13). Ms. Burge subsequently informed Capt. Schnering of her decision to resign. (Id.; Doc. # 37-3).

Regarding the investigation and end of her employment, Ms. Burge avers that she was treated worse than two

comparators: "Sergeant Marvina Johnson [] and Major Tom Porter [], who were not disciplined, forced to resign, or terminated for their relationships or associations with convicted felons." (Doc. # 45-1 at ¶ 8). Regarding alleged sex discrimination, Ms. Burge emphasizes that Major Porter, a white man, was friends with a man named Dave Boldin, "who was convicted of a 2nd degree felony, for written threats to kill, and they post their 'relationship' all over Facebook, and even attend football games together when Sheriff Wells is present." (Id. at ¶ 25). "Manatee County Central Jail phone records prove that while incarcerated, [Mr.] Boldin was calling comparator [Major] Porter, on his personal phone number." (Id. at ¶ 8). According to Capt. Schnering, "Mr. Boldin is not a convicted felon" because the state court "withheld adjudication of guilt in Mr. Boldin's case effective January 27, 2017." (Doc. # 34 at ¶ 29). Additionally, unlike Ms. Burge's case, "no one has ever made a complaint regarding any alleged association between Major Porter and Mr. Boldin." (Id. at ¶ 30).

Regarding alleged race discrimination, Ms. Burge points to Ms. Johnson, who is Black and who Ms. Burge asserts "wasn't fired, for . . . being in a serious, live-in, intimate, real relationship with a convicted felon" and "conducting a

criminal history check" on her boyfriend. (Doc. # 45-1 at ¶ 25). A few months after the MCSO discovered "that [Ms.] Johnson was still engaged in the relationship," Ms. Johnson "was provided with the opportunity to resign." (Id.). Ms. Johnson resigned in 2003, over a decade before Sheriff Wells became sheriff and a decade before Ms. Burge began working with the MCSO. (Doc. # 34 at ¶ 28).

### C.    The MCSO's Referral of Ms. Burge to FDLE

When a law enforcement officer separates from a law enforcement agency, the employing agency must notify the Florida Department of Law Enforcement ("FDLE") via an affidavit of separation that details the facts and reasons for the separation. Fla. Stat. § 943.139(1)-(2); (Doc. # 34 at ¶ 17). FDLE's affidavit of separation is executed under oath. Fla. Stat. § 943.139(2).

Misuse of law enforcement databases is a moral character violation under the Florida Administrative Code if certain conditions are met. See 11B-27.0011(14), Fla. Admin. Code. Specifically, the access of the electronic database must be "for an illegitimate or personal purpose with bad intent." Id. "Bad intent may be evidenced by," among other things, "[a] pattern of misuse that demonstrates improper accesses or violations" or "[t]he existence of a current or past non-

amicable or otherwise contentious relationship between the officer and the subject of the query." Id. Ms. Burge avers that she "did not access any database with bad intent, for personal gain, or in violation of training or prior discipline" such that this rule "is inapplicable to the facts at issue." (Doc. # 45-1 at ¶ 34).

The MCSO completed the affidavit of separation designating Ms. Burge's separation as "Voluntary separation or retirement while being investigated for . . . violation of moral character standards defined in Rule 11B-27.0011." (Doc. # 34 at ¶ 18; Doc. # 35-14). Because she insists she did not commit a moral character violation of any kind, Ms. Burge avers that it was inappropriate for the MCSO to have used this designation on the form. (Doc. # 45-1 at ¶ 35). The MCSO subsequently sent a copy of Ms. Burge's investigative file to FDLE on or about December 20, 2022. (Doc. # 34 at ¶ 21; Doc. # 34-2 at 2-3).

In December 2024, Ms. Burge filed this lawsuit alleging that FDLE had cleared her of any wrongdoing. (Doc. # 1 at ¶¶ 36-38). In January 2025, Capt. Schnering contacted FDLE and requested a copy of their investigative file. (Doc. # 34 at ¶ 20; Doc. # 34-2 at 3). In response, FDLE advised the MCSO in an email that it had no record of receiving Ms. Burge's

file. (Doc. # 34 at ¶ 21; Doc. # 34-2 at 2-3). At FDLE's request, the MCSO re-sent the investigative file to FDLE on January 15, 2025. (Doc. # 34-2 at 2). Ms. Burge disputes FDLE's statement in the January 2025 email that FDLE had no record of Ms. Burge's file. Ms. Burge maintains that she was "cleared . . . of all wrongdoing" in May 2023 and that she had informed the MCSO of this. (Doc. # 45-1 at ¶ 36).

Nevertheless, in March 2025, FDLE found probable cause to file an administrative complaint against Ms. Burge. (Doc. # 34 at ¶¶ 22-23). The administrative complaint regarded the same six occasions where Ms. Burge accessed law enforcement databases as noted in the MCSO's internal investigation. (Id. at ¶ 23; Doc. # 34-4). Subsequently, the administrative complaint against Ms. Burge was dismissed because the FDLE investigation into Ms. Burge was not completed within the mandatory six months after receipt of the file from the MCSO. (Doc. # 43-3 at 189). Although FDLE received all case materials in December 2022, "for reasons undetermined, the assigned case specialist did not open the case at that time and therefore, the case was never prepared for presentation at a probable cause hearing" and "it is thought that [Ms. Burge's] case was completely deleted by someone within FDLE."

(<u>Id.</u> at 188-89); <u>see</u> <u>also</u> (<u>Id.</u> at 189) ("[T]he delay in this case was severe and was caused by a bad actor within FDLE.").

###### D.   **Procedural History**

As mentioned before, Ms. Burge initiated this action against Sheriff Wells in December 2024. (Doc. # 1). She asserts three claims: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count I); (2) race discrimination in violation of 42 U.S.C. § 1983 (Count II); and (3) retaliation in violation of 42 U.S.C. § 1983 (Count III). (<u>Id.</u>). Sheriff Wells filed his answer (Doc. # 13), and the case proceeded through discovery.

Sheriff Wells now moves for summary judgment on all Ms. Burge's claims. (Doc. # 33). The Motion is fully briefed (Doc. ## 42, 44, 48), and ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the

non-moving party's favor. <u>Shotz v. City of Plantation</u>, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the Court should not grant summary judgment. <u>Samples ex rel. Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. <u>Morris v. Ross</u>, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. <u>Analysis</u>

Sheriff Wells seeks summary judgment on all claims. He raises numerous arguments for why the claims fail. The Court addresses them in turn.

### A. <u>Ms. Burge's Declaration</u>

As a preliminary matter, the main record evidence Ms. Burge relies on in opposition to summary judgment is her own 28-page declaration. (Doc. # 45-1).

Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify

on the matters stated." Fed. R. Civ. P. 56(c)(4). "A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). "[C]onclusory statements [in a declaration or affidavit] do not establish a disputed issue of material fact." Ojeda v. Louisville Ladder Inc., 410 F. App'x 213, 215 (11th Cir. 2010) (describing plaintiff's statement in an affidavit "that, in his opinion, the ladder collapsed because its 'lateral and angular support [did] not properly support[][his] weight'" as conclusory such that it did not establish a disputed issue of material fact). Neither do legal conclusions. Id.; see also Avirgan, 932 F.2d at 1577 ("The evidence presented cannot consist of conclusory allegations or legal conclusions.").

The Court agrees with Sheriff Wells that Ms. Burge's declaration is replete with speculation, conclusory assertions, legal argument, and inadmissible hearsay. (Doc. # 48 at 1). For example, although she has no personal experience with the CSAB appeals process, Ms. Burge asserts in conclusory fashion that "the CSAB does not provide any genuine protection or independent review for employees facing

26

termination" because "it is a perfunctory procedure designed to give the appearance of fairness while ensuring the Sheriff's decisions are upheld." (Doc. # 45-1 at ¶¶ 10-12). At other points, Ms. Burge asserts legal conclusions, such as that the MCSO's resubmission of her file to FDLE was "unlawful and retaliatory" and that the timing of her interview with MCSO investigators was a "violation of the rights afforded to [her] under Florida Statutes § 112, the Law Enforcement Officers' Bill of Rights." (Id. at ¶¶ 31, 38).

Where Ms. Burge has attempted to refute one of Sheriff Wells's statements of material fact with a legal conclusion, conclusory statement, or statement for which Ms. Burge does not have personal knowledge, the Court will disregard Ms. Burge's statement on that point and treat Sheriff Wells's statement of material fact as undisputed on that point. See Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion.").

**B.   Section 1983 Claims and Final Policymaker**

Ms. Burge's Section 1983 race discrimination and retaliation claims fail. First, Sheriff Wells is correct that

Ms. Burge failed to specify what constitutional rights her Section 1983 claims were based on in her complaint. "Section 1983 is merely a vehicle by which to bring these suits; it does not create any substantive federal rights. Therefore, the plaintiff must point to a specific federal right that the defendant violated." Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1299 (11th Cir. 2007) (citations omitted). Nevertheless, the Court will not dismiss these claims as improperly pled. Rather, the Court determines that the Section 1983 claims fail because Sheriff Wells was not the final decisionmaker for Ms. Burge's alleged termination, which for purposes of this section the Court assumes was a termination.

A suit against a municipal officer in his official capacity is effectively a suit against the government entity that the officer represents. Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1115 (11th Cir. 2005). Thus, Ms. Burge's suit is against Manatee County itself and therefore attempts to hold Manatee County liable for Sheriff Wells's actions. A municipality, such as Manatee County, cannot be liable under § 1983 on a theory of respondeat superior. Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 691 (1978).

A plaintiff suing a municipality can recover under §
1983 only if "action pursuant to official municipal policy of
some nature caused a constitutional tort." Id.; see Cook, 402
F.3d at 1116 (stating that § 1983 liability exists only when
the constitutional violation was the result of an official
municipal policy). "Municipal liability under 42 U.S.C. §
1983 may be premised upon a single illegal act by a municipal
officer only when the challenged act may fairly be said to
represent official policy, such as when that municipal
officer possesses final policymaking authority over the
relevant subject matter." Morro v. City of Birmingham, 117
F.3d 508, 510 (11th Cir. 1997); see also Pembaur v. City of
Cincinnati, 475 U.S. 469, 481 (1986). "[W]hether a particular
official has 'final policymaking authority' is a question of
state law." City of St. Louis v. Praprotnik, 485 U.S. 112,
123 (1988) (emphasis in original). "Therefore, in order for
[Ms. Burge] to prevail on [her] § 1983 claim[s], Sheriff
[Wells] must have been the final policymaker with regard to
[Ms. Burge's alleged termination]." Lopez v. Gibson, 770 F.
App'x 982, 991–92 (11th Cir. 2019).

"An official is not a final policymaker where his
decisions are subject to 'meaningful administrative review.'"
Id. at 992 (quoting Scala v. City of Winter Park, 116 F.3d

29

1396, 1401 (11th Cir. 1997)). "Generally, the existence of a reviewing body suffices to find that an official whose decisions are subject to review was not a final policymaker." Id. The Eleventh Circuit "has found meaningful administrative review where there was review by a Career Service Council with the authority to order reinstatement or otherwise amend, alter, sustain, or reverse the decision of the employer." Id. (citation omitted); Quinn v. Monroe Cty., 330 F.3d 1320, 1322-24, 1326 (11th Cir. 2003) (concluding that county administrator was not the final policymaker with respect to county library director's termination because the county administrator's termination decision was subject to meaningful administrative review by the Career Service Council). Additionally, the Eleventh Circuit has "found meaningful administrative review where there was review by a Civil Service Board with power to reverse an employer's termination decision." Id. (citation omitted); see also Scala, 116 F.3d at 1397-98, 1402-03 (holding that city manager and public safety director's decision to terminate employee was subject to meaningful administrative review by the Civil Service Board and thus they were not final policymakers).

So too here. The Court agrees with Sheriff Wells that his "termination decisions for permanent status employees

such as Ms. Burge are at all times subject to review by a five-member CSAB whose decisions are legally binding on the Sheriff." (Doc. # 33 at 14); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1183 (M.D. Fla. 2007) ("[I]t is clear that the Sheriff was not the final policymaker. The Civil Service Board had the legal authority to review and reverse the Sheriff's termination decision, and its decision is binding on the Sheriff."), aff'd, 269 F. App'x 941 (11th Cir. 2008). "Florida law provides an appeal process for [MCSO] career-service employees 'arising from disciplinary actions brought under the sheriff's rules, procedures, or polices which result in dismissal, suspension, demotion, or reduction in pay.'" Dixon v. Hansell, 844 F. App'x 198, 202 (11th Cir. 2021) (quoting 2000 Fla. Laws, Ch. 2000-388 §§ 1(1), 3(1), 4). "Deputy sheriffs are career-service employees." Id. (citation omitted). "The CSAB 'shall, by majority vote, dispose of the appeal by making findings of fact and issuing a written decision to the sheriff and the [employee].'" Id. (citation omitted). "The CSAB's decision shall either sustain or not sustain the employee's discipline and may modify any disciplinary action that was the subject of the appeal." Id. (citation omitted). Thus, Sheriff Wells was not the final policymaker for Ms. Burge's supposed termination. See Leath

v. Hansell, No. 6:06-cv-896-PCF-DAB, 2008 WL 151869, at *5 (M.D. Fla. Jan. 15, 2008) (finding that sheriff was not the final policymaker for a deputy's termination because "the Sheriff's termination decisions are reviewed by the Career Service Board").

Furthermore, after the CSAB rules, the CSAB's decision is then further reviewable by a Florida circuit court under Rule 9.030(c)(3). See Fla. R. App. P. 9.030(c)(3). The Court does not accept Ms. Burge's conclusory assertion, made without any sign of personal knowledge, that the "theoretical right to further appeal under Rule 9.030 offers no realistic avenue of relief for employees." (Doc. # 45-1 at ¶ 12). There is no evidence that an appeal to the circuit court would not provide meaningful review.

True, "a plaintiff can attempt to demonstrate that the reviewing body's administrative review is not meaningful, such that the official should be considered the final policymaker." Lopez, 770 F. App'x at 992 (citing Quinn, 330 F.3d at 1326; Scala, 116 F.3d at 1402). "To succeed in such an argument, the plaintiff needs to show that the reviewing body has defective procedures, merely 'rubber stamps' the official's decision, or ratifies the official's decision and

improper motive." Id. Crucially, "[i]t is the plaintiff's burden to show that the official is a final policymaker." Id.

Ms. Burge has not carried that burden. She admits that three employees have either had discipline reduced or a termination overturned through the CSAB process since 2004 but points out that the CSAB has not ruled in favor of an appealing employee during Sheriff Wells's tenure. (Doc. # 45-1 at ¶ 12). But a low reversal rate does not establish that the CSAB process is a sham. See Maschmeier v. Scott, 269 F. App'x 941, 944 (11th Cir. 2008) ("Given the minority of cases in which the employee is seeking a reversal of his or her termination, one overturned termination in fifteen years is not sufficient to show that the Board is a mere 'rubber stamp.'"). And while it is distasteful that MCSO members "brag" when the CSAB rules in its favor (Doc. # 45-1 at ¶ 10), that is not proof that the CSAB's procedures are defective or that it merely rubberstamps Sheriff Wells's decisions. Ms. Burge has not provided any "actual evidence that the Career Service Board process was in any way defective, rigged in favor of the Sheriff, or used to ratify an improper motive." Dixon v. Gibson, No. 6:18-cv-1376-GAP-DCI, 2020 WL 10090796, at *5 (M.D. Fla. Mar. 11, 2020), aff'd sub nom. Dixon v. Hansell, 844 F. App'x 198 (11th Cir. 2021).

Indeed, courts presented with as much or more evidence than Ms. Burge has provided have nevertheless held that the career service appeals board process constituted "meaningful review" of an employment decision. See Id. (finding that sheriff was not the final policymaker for plaintiff's termination because the two declarations provided by individuals who had previously served on a Career Service Board at another employee's request "at most" provided "evidence that [the two individuals] disagreed with the decision reached by the majority of their respective boards"); Leath, 2008 WL 151869, at *5 (finding evidence that the Career Service Board upheld the terminations of the plaintiff and two others was not sufficient to establish that the Board was a "rubber stamp" for the sheriff's decisions and noting that the Board had "overturned at least one termination"); Maschmeier, 508 F. Supp. 2d at 1183–84 (finding insufficient evidence that the Board "rubber stamped" the sheriff's decisions where "the Board had overturned the sheriff's decision on one occasion").

Therefore, for purposes of Monell liability, Sheriff Wells was not the final decisionmaker for Ms. Burge's alleged termination. See Lopez, 770 F. App'x at 993 ("Sheriff Gibson was not the final policymaker with respect to Lopez's demotion

because Florida law specifically delegated that authority to the Career Service Appeals Board. . . . [T]he Appeals Board had the power to review and reverse the Sheriff's discipline, and the Sheriff was bound by the Appeals Board's decision. Further, Sheriff Gibson's demotion of Lopez was subject to meaningful administrative review by the Appeals Board, which heard witnesses, deliberated, and issued its own fact findings and decision." (citations omitted)). For that reason, Ms. Burge's Section 1983 claims fail. The Motion is granted as to Counts II and III.

### C.    **Title VII Claim**

That leaves only Count I, Ms. Burge's Title VII sex discrimination claim. "In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." Lewis v. City of Union City, 918 F.3d 1213, 1220 (11th Cir. 2019). "One way that she can do so is by satisfying the burden-shifting framework set out in [McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)]." Id. "When proceeding under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was

qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." Id. at 1220-21. "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." Id. at 1221. "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination.'" Id. (citation omitted).

### 1.    Adverse Employment Action

First, Ms. Burge's Title VII claim fails because she did not suffer an adverse employment action.[1] Instead, she voluntarily resigned.

"Although 'employee resignations are presumed to be voluntary,' a 'constructive discharge' is involuntary." Johnson v. Fla. Dep't of Corr., 829 F. App'x 889, 893 (11th

---

[1] Ms. Burge's Section 1983 claims would also fail for this alternative reason. She resigned and, thus, was not terminated for racially discriminatory or retaliatory reasons.

Cir. 2020) (quoting Hargray v. City of Hallandale, 57 F.3d 1560, 1567-68 (11th Cir. 1995)). "An involuntary resignation that constitutes a constructive discharge is an adverse employment act under Title VII." Ross v. City of Perry, 396 F. App'x 668, 670 (11th Cir. 2010). In the context of a Section 1983 case, the Eleventh Circuit has identified "two situations in which an employee's resignation will be deemed involuntary . . . : (1) where the employer forces the resignation by coercion or duress; or (2) where the employer obtains the resignation by deceiving or misrepresenting a material fact to the employee." Hargray, 57 F.3d at 1568 (citations omitted). "Under the coercion or duress theory, [courts] consider whether, under the totality of the circumstances, the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to resign." Id. "Although [a plaintiff] may have felt intimidated, courts objectively scrutinize the situation rather than relying on an employee's subjective analysis." Steele v. Valley Nat'l Bank, No. 6:18-cv-2047-WWB-LRH, 2020 WL 12597711, at *4 (M.D. Fla. Mar. 9, 2020).

The Eleventh Circuit has previously applied Hargray in a case raising both Section 1983 and Title VII claims, Ross, 396 F. App'x at 670, which is perhaps why Defendant focuses

37

on the Hargray test in his Motion. See also Steele, 2020 WL 12597711, at *3-4 (applying Hargray in a Florida Civil Rights Act race and age discrimination case). Yet, in other Title VII cases, the Eleventh Circuit has applied a different test to determine if a constructive discharge occurred. "[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993) (citation omitted). "[A] plaintiff 'must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign.'" Id. (citation omitted).

Ms. Burge argues that her resignation was involuntary such that it qualifies as a termination. According to her, "the senior leadership of the Sheriff's Office intentionally misrepresented the case against her, telling her that the decision to terminate her had already been made, and that if she [chose] to voluntarily resign, her ability to work in her profession would not be compromised." (Doc. # 42 at 11).

Not so. Under either Hargray or Morgan, the record does not establish a genuine dispute of material fact as to whether

38

Ms. Burge's resignation was involuntary. At most, Ms. Burge
faced a stressful investigation into her relationship with
Mr. Bradshaw and alleged misuse of law enforcement databases.
The fact that the investigation was certain to result in her
termination did not render Ms. Burge's resignation
involuntary. Importantly, "resignations can be voluntary even
where the only alternative to resignation is facing possible
termination for cause or criminal charges." Hargray, 57 F.3d
at 1568. "Resignations obtained in cases where an employee is
faced with such unpleasant alternatives are nevertheless
voluntary because 'the fact remains that plaintiff *had a
choice.* [Plaintiff] could stand pat and fight.'" Id.
(citation omitted).[2]

There is not sufficient evidence that Ms. Burge was
coerced or deceived into resigning or faced intolerable

---

[2] "The one exception to this rule is where the employer
actually lacked good cause to believe that grounds for the
termination . . . existed." Id. This exception does not apply.
The MCSO received a complaint from Ms. Porcelli about Ms.
Burge's relationship with Mr. Bradshaw, a felon, and about
her alleged misuse of law enforcement databases. This
complaint gave Sheriff Wells good cause to initiate his
investigation. The evidence then uncovered during the
investigation, including the romantic messages with Mr.
Bradshaw and multiple queries related to Mr. Bradshaw or
people associated with him in law enforcement databases,
suggested that Ms. Burge had violated MCSO policies and
procedures.

conditions to create a genuine dispute of material fact. The
Court accepts as true Ms. Burge's version of events under
which Capt. Schnering "told [her] that if [she] did not submit
a resignation, [she] would be fired, would lose all of [her]
accrued vacation pay, and that [her] retirement benefits
would be negatively affected." (Doc. # 45-1 at ¶ 3).

Nevertheless, this fact does not render Ms. Burge's
resignation involuntary. Ms. Burge still had the choice to be
terminated and then appeal her termination through the MCSO's
CSAB. See Ross, 396 F. App'x at 670 (holding that a
resignation was not coerced where the employee could have
asked for more time to consider the choices and to seek
attorney help, but did not; understood the nature of the
choices; and, although he might have believed he had no choice
but to resign, he in fact did have the choice to refuse to
resign and later to appeal the termination); Steele, 2020 WL
12597711, at *4 ("Although Plaintiff was faced with an
unpleasant choice [of resignation or termination], that,
alone, does not render her resignation involuntary."). To
help her consider this choice, Ms. Burge had her
representative Mr. Lawless with her for advice, although he
was not an attorney. There is no evidence that Ms. Burge
requested to speak with an attorney or have an attorney

accompany her to her interview. She had the choice not to undergo the interview but chose to participate in the interview. Once she decided that she wished the interview to end, the interview ended. Ms. Burge was given until noon the next day to calm down and make her decision on how she to proceed. When that time came, Ms. Burge resigned. This is not a case "in which the employee's repeated requests for additional time and to speak to counsel were ignored, the employee was not informed of the charges or grounds for termination, and threatening tactics were used." Gentry v. City of Russellville, Alabama, 406 F. Supp. 3d 1231, 1251 (N.D. Ala. 2019).

Ms. Burge debates the likelihood that, if she had declined resignation and was terminated, she would have her termination vacated by the CSAB. As previously discussed, the Board had overturned discipline imposed by sheriffs in the past (even if not that recently). Ms. Burge had the ability to appeal to this Board. Furthermore, if the CSAB ruled against her, Ms. Burge could further appeal the CSAB's decision to a state circuit court. Fla. R. App. P. 9.030(c)(3). Again, the Court does not accept Ms. Burge's conclusory assertion, made without any sign of personal knowledge, that the "theoretical right to further appeal

under Rule 9.030 offers no realistic avenue of relief for
employees." (Doc. # 45-1 at ¶ 12). Ms. Burge's ability to
fight a termination, if it occurred, was far from illusory.

In short, Ms. Burge's resignation was voluntary. The
totality of the circumstances would not allow a reasonable
jury to find that Ms. Burge was coerced or deceived into
resigning. Because she resigned, there is no genuine dispute
whether Sheriff Wells took an adverse employment action
against Ms. Burge. Without an adverse action, Ms. Burge cannot
establish her claim against Sheriff Wells.

### 2. __Comparator Evidence__

Even if Ms. Burge had established an adverse employment
action, her sex discrimination claim would fail for another
reason: lack of relevant comparators.

"[A] meaningful comparator analysis must be conducted at
the prima facie stage of McDonnell Douglas's burden-shifting
framework, and should not be 'move[d]' to the pretext stage.
. . . [A] plaintiff asserting an intentional-discrimination
claim under McDonnell Douglas must demonstrate that she and
her proffered comparators were 'similarly situated in all
material respects.'" Lewis, 918 F.3d at 1218. "A plaintiff
needn't prove . . . that she and her comparators are identical
save for their race or gender." Id. at 1227. "Nor is it

necessary for a plaintiff to prove purely formal similarities — *e.g.*, that she and her comparators had precisely the same title." Id. A similarly situated comparator, however, ordinarily "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's employment or disciplinary history." Id. at 1227-28. "[A] plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" Id. at 1228 (citation omitted).

For her sex discrimination claim, Ms. Burge asserts that Major Tom Porter is a materially similar comparator. (Doc. # 42 at 3, 8-9, 17-18; Doc. # 45-1 at ¶ 8). According to Ms. Burge, Major Porter's friendship with Mr. Boldin "was similar or worse conduct" than her relationship with Mr. Bradshaw. (Doc. # 42 at 3). She conclusorily avers that Mr. Boldin "was convicted of a 2nd-degree felony for written threats to kill." (Id. at 8). "Manatee County Central Jail phone records prove that while incarcerated, [Mr.] Boldin was calling comparator [Major] Porter on his personal phone number." (Id. at 3). But

Major Porter faced no discipline for this friendship with someone whom Ms. Burge calls "a convicted felon." (Id. at 8). Aside from the friendship with Mr. Boldin, Ms. Burge also avers that, in September 2025, Major Porter was not disciplined for "provid[ing] a false name to a law enforcement officer to conceal his true identity in connection with an investigation involving another MCSO lieutenant's criminal conduct." (Doc. # 45-1 at ¶ 40).

The first issue with this argument is that Mr. Boldin is not "a convicted felon." As Capt. Schnering explains in his affidavit, the court "withheld adjudication of guilt in Mr. Boldin's case effective January 27, 2017." (Doc. # 34 at ¶ 29). Despite this, MCSO General Order 1013 provides that "Employees shall not associate or have contact with any person whom they know or reasonably should know are convicted felons, or *who are under criminal investigation*, indictment or sentence for a felony offense, or *who are incarcerated in any local, state, or federal correctional facility*, or members of documented street gangs, unless such person is a member of the immediate family." (Doc. # 34-1 at § 12.1.38) (emphasis added). Thus, Ms. Burge has provided evidence that Major Porter did violate § 12.1.38 by associating with Mr. Boldin

while he was under investigation and incarcerated, even though Mr. Boldin does not qualify as a felon.

Nevertheless, the calls between Mr. Boldin and Major Porter took place in 2016, which is before Sheriff Wells was sheriff. See Lewis, 918 F.3d at 1227–28 (noting that a similarly situated comparator "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"); Winthrop v. Nocco, No. 8:18-cv-1452-JSM-AEP, 2019 WL 13272283, at *3 (M.D. Fla. Aug. 8, 2019) ("Winthrop did identify officer Kevin Doll, who she claims was arrested for domestic violence and not terminated, but this occurred in 2008, under a different Sheriff, i.e., a different decisionmaker, which is a material difference and therefore insufficient to create a genuine issue of fact.").

Furthermore, Ms. Burge does not present any evidence that Major Porter ever used law enforcement databases to look up Mr. Boldin or shared information from those databases with Mr. Boldin. Thus, Mr. Porter's alleged misconduct (being friends with Mr. Boldin) is not the same as Ms. Burge's alleged misconduct (associating with Mr. Bradshaw and misusing law enforcement databases). See Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022) ("Jackson and Saussy are not proper comparators because there is no evidence that they

45

engaged in similar misconduct as Jenkins. Jenkins was terminated for failing to follow a supervisor's order in violation of Rule A-6 of the GPA's Code of Conduct. Neither Jackson nor Saussy engaged in similar insubordination or failed to follow direct orders."). Likewise, Major Porter's misconduct of providing a false name to law enforcement in September 2025, which was in fact punished by the MCSO (Doc. ## 48-1, 48-2, 48-3), is not similar in character to Ms. Burge's conduct of fraternizing with a felon and misusing law enforcement databases.

Undermining any similarity between Ms. Burge and Major Porter further, "no one has ever made a complaint regarding any alleged association between Major Porter and Mr. Boldin." (Doc. # 34 at ¶ 30). In sharp contrast, a civilian directly contacted the MCSO's Office of Professional Standards to complain about Ms. Burge's relationship with Mr. Bradshaw, instigating the launch of the investigation against Ms. Burge. That is, Ms. Burge's alleged violations were brought directly to Sheriff Wells's attention through a complaint, whereas Ms. Burge merely asserts that Sheriff Wells should have known that Major Porter was associating with Mr. Boldin based on their social media posts and attendance of public events together. This is not a materially similar situation.

46

Considering all the above, there is no genuine dispute over whether Major Porter is similarly situated in all material respects to Ms. Burge. He is not. Major Porter is the only male comparator presented by Ms. Burge. True, Ms. Burge avers that "other deputies accused of database misuse were not terminated or forced to resign." (Doc. # 45-1 at ¶ 22). But she does not argue in her response that any individuals besides Major Porter and Ms. Johnson are comparators, nor does she identify any of these individuals. (Doc. # 42 at 17). To the extent Ms. Burge also points to Ms. Johnson, Ms. Johnson cannot serve as a comparator for this sex discrimination claim.[3] Ms. Johnson, like Ms. Burge, is female.

Ms. Burge has not presented any appropriate comparator for her Title VII claim and, therefore, has not established

---

[3] Ms. Johnson is also not a comparator similarly situated in all material respects to Ms. Burge for purposes of Ms. Burge's Section 1983 race discrimination claim. Ms. Johnson is a Black woman who had a romantic relationship with a Black felon. There is no evidence that a member of the public complained to the MCSO about Ms. Johnson, as occurred with Ms. Burge. Also, Ms. Johnson resigned in 2003, over a decade before Sheriff Wells became sheriff. (Doc. # 34 at ¶ 28); see also Winthrop, 2019 WL 13272283, at *3. Finally, while under investigation for her relationship and her misuse of a law enforcement database, Ms. Johnson resigned. Thus, like Ms. Burge, Ms. Johnson did not keep her employment with the MCSO when her relationship with a felon and misuse of databases was investigated.

a prima facie case of sex discrimination. Summary judgment is warranted on this basis as well.

### 3.    **Pretext**

Alternatively, even if Ms. Burge had established a prima facie case of discrimination under Title VII, her claim would fail at the pretext stage.[4]

Sheriff Wells has identified a non-discriminatory reason for the alleged termination of Ms. Burge: the investigation "confirmed [Ms.] Burge had a prolonged association with [Mr.] Bradshaw, despite knowing he was a convicted felon, over the course of approximately 14 months," and Ms. Burge "had accessed law enforcement databases with no ascertainable law enforcement purpose." (Doc. # 33 at 22). Thus, Sheriff Wells has met his burden of production. The burden now shifts to Ms. Burge to show that there is a genuine dispute of material fact regarding whether the proffered reason was pretextual.

---

[4] If summary judgment had not already been granted for the Section 1983 race discrimination and retaliation claims on final policymaker grounds, summary judgment would be granted on those claims on pretext grounds. Sheriff Wells had a good faith belief that Ms. Burge had been associating with a felon and misused law enforcement databases. Ms. Burge has not established that this legitimate, nondiscriminatory reason was false and also a pretext for any form of discrimination or retaliation.

The Eleventh Circuit has "repeatedly emphasized that '[p]rovided . . . the proffered reason [for an adverse employment action] is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it.'" Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)). "Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Id. (citation omitted). "[A] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" Springer v. Convergys Customer Mgmt. Grp. Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted). The Court cannot second guess the defendant's business judgment or inquire as to whether its decision was "prudent or fair." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 2003).

Here, Ms. Burge has failed to carry her burden. Even assuming that Ms. Burge's resignation was involuntary, Ms.

Burge cannot show that Sheriff Wells's reasons for terminating her were a pretext for gender discrimination. Again, Sheriff Wells began his investigation into Ms. Burge because of a complaint from Ms. Porcelli that Ms. Burge had a romantic relationship with Mr. Bradshaw and that Ms. Burge had used law enforcement databases to provide information to Mr. Bradshaw and others associated with him. (Doc. # 36 at ¶ 3; Doc. # 36-1 at 6). Importantly, GO 1013 provides that MCSO employees "shall not associate or have contact with any person whom they know or reasonably should know are convicted felons." (Doc. # 34 at ¶ 5; Doc. # 34-1 at § 12.1.38). GO 1013 also precludes (1) the unauthorized access of any NCIC/FCIC system, (2) disclosure of such information to unauthorized individuals, or (3) violation of FCIC/NCIC rules, regulations, or procedures. (Doc. # 34 at ¶ 5; Doc. # 34-1 at § 12.3.38).

During the investigation, Sheriff Wells uncovered troubling messages between Ms. Burge and Mr. Bradshaw. Among the 2,500 messages they exchanged were multiple messages suggesting Ms. Burge and Mr. Bradshaw had a romantic relationship. Ms. Burge denies that she had a romantic, sexual, or flirtatious relationship with Mr. Bradshaw (Doc. # 45-1 at ¶¶ 17-21), which the Court accepts as true.

50

Nevertheless, what matters is whether Sheriff Wells in good faith believed such a relationship existed based on the evidence obtained in the investigation. <u>See</u> <u>Gogel</u>, 967 F.3d at 1148 ("The relevant inquiry is [] whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee."). "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." <u>Alvarez v. Royal Atl. Devs., Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010). "When an employer is told of improper conduct at its workplace, the employer can lawfully ask: is the accusation true? When the resulting employer's investigation . . . produces contradictory accounts of significant historical events, the employer can lawfully make a choice between the conflicting versions — that is, to accept one as true and to reject one as fictitious — at least, as long as the choice is an honest choice." <u>E.E.O.C. v. Total Sys. Servs., Inc.</u>, 221 F.3d 1171, 1176 (11th Cir. 2000).

There was certainly enough evidence for Sheriff Wells to believe that a romantic or at least flirtatious relationship existed between Ms. Burge and Mr. Bradshaw. Specifically, the Facebook messages, while also including normal discussions

about Mr. Bradshaw's family and Ms. Burge's mentorship of one
of Mr. Bradshaw's children, included numerous messages about
the romantic and sexual attraction between Ms. Burge and Mr.
Bradshaw. (Doc. # 36-6). For example, Mr. Bradshaw refers
once to a time when Ms. Burge had her "tongue in [his] mouth."
(Id. at 31). Ms. Burge noted that "Every time I see you . .
. Or hugged you . . . Or been around you . . . That dick is
rock hard," to which Mr. Bradshaw responded that he was
"attracted to," "infatuated," and "in love" with Ms. Burge.
(Id. at 34). Ms. Burge responded to the statement that Mr.
Bradshaw was attracted to her with heart-eyed emojis. (Id.).
On another occasion, after Mr. Bradshaw expressed his desire
to "make love" to Ms. Burge, Ms. Burge responded: "There is
enough chemistry between us and love and support for each
other, that we both know [sex] would be magical! Easily!"
(Id. at 37).

Additionally, while he acknowledged they had not had
sex, Mr. Bradshaw told investigators that he and Ms. Burge
had "kissed . . . numerous times" and touched and "rubbed"
each other over their clothing in a sexual manner. (Doc. #
36-3 at 7, 9). While Ms. Burge maintains that Mr. Bradshaw's
statements to investigators were "unreliable" and motivated
by "personal bias" against her (Doc. # 45-1 at ¶ 20), she

does not dispute that Mr. Bradshaw told the investigators that physical contact had occurred. Sheriff Wells was permitted to accept Mr. Bradshaw's version of events in deciding whether Ms. Burge had engaged in misconduct.

There was also evidence strongly suggesting Ms. Burge had misused law enforcement databases. Again, Ms. Burge argues that her use of law enforcement databases was not a violation, and she had a legitimate law enforcement purpose for each search, even when she was off duty or was out on a call that did not directly involve Mr. Bradshaw or those connected to him. (Doc. # 45-1 at ¶¶ 22, 24). She also avers that she did not have "bad intent" in performing searches at Mr. Bradshaw's request. (Id. at ¶ 22). The Court accepts this as true.

Given the results of the investigation, however, Sheriff Wells was not required to accept that Ms. Burge had done no wrong. The MCSO investigation uncovered six queries in law enforcement databases that investigators considered "potential misuse" and done "with no apparent law enforcement purpose," leading the MCSO to conclude that Ms. Burge "engaged in a pattern of FCIC/NCIC misuse in which she queried [Mr.] Bradshaw and his paramours for no lawful purpose." (Doc. # 36-1 at 8-9, 38); see also (Doc. # 43-1 at Ex. 10) (stating

the "bad intent" necessary to establish misuse of databases "may be evidenced by" "[a] pattern of misuse that demonstrates improper accesses or violations"). These searches all involved the name or license plates of Mr. Bradshaw, Ms. Porcelli (Mr. Bradshaw's girlfriend), and the mother of Mr. Bradshaw's children. (Doc. # 36-1 at 8-9). Accepting that these queries were for legitimate law enforcement purposes, the investigators nevertheless had a good faith belief that they were not. The investigation report states that "at the times [Ms.] Burge performed the queries, no related calls for service involving the queried individual was taking place." (Id. at 37). "[A]t one time, [Ms.] Burge was not working when the queries were conducted," which would allow Sheriff Wells to determine the searches were not for law enforcement purposes. (Id.).

Likewise, although Mr. Bradshaw told investigators that Ms. Burge had never "look[ed] up cases" for him, he said that Ms. Burge had frequently looked up Ms. Porcelli's "case plan" for her children and spoke about the information in it with Mr. Bradshaw. (Doc. # 36-3 at 11-12, 16). Mr. Bradshaw also said that he would sometimes ask Ms. Burge to look up his license plate for his car to "see if the plate's coming back to [him] or not," and Ms. Burge would. (Id. at 11). Likewise,

54

in a recorded jail call, Mr. Bradshaw told his girlfriend that he called Ms. Burge while he was driving and being followed by a MCSO patrol vehicle, which subsequently pulled him over and resulted in his arrest on an outstanding warrant. (Doc. # 36-1 at 13). He said that during his call to Ms. Burge while he was driving, he inquired if there was a warrant for his arrest and Ms. Burge searched and incorrectly said there was no warrant. (Id.). Notably, Ms. Burge appeared at the scene of the stop and "questioned the validity of the stop, challenging Deputy Merrill's detainment, advocating for [Mr.] Bradshaw and undermining Deputy Merrill." (Id. at 36). No reasonable jury would find Sheriff Wells's determination that Ms. Burge had inappropriately used the law enforcement databases to share information with Mr. Bradshaw "unworthy of credence." Gogel, 967 F.3d at 1136.

Given the above, no reasonable jury could conclude that Sheriff Wells's determination that Ms. Burge was fraternizing with a felon and misusing databases was false, let alone a pretext for discrimination. Ms. Burge's insistence that Sheriff Wells inaccurately marked her affidavit of separation as a resignation while under investigation for a moral character violation (Doc. # 45-1 at ¶¶ 24, 34-35) does not rebut that Sheriff Wells believed that Ms. Burge had

fraternized with a felon and misused databases. Also unavailing is Ms. Burge's contention that Sheriff Wells's re-forwarding its investigation file to FDLE in January 2025 (years after her employment ended) supports that the earlier investigation was discriminatory. Besides her declaration statements being conclusory (Doc. # 45-1 at ¶ 36), the record evidence shows that FDLE asked the MCSO to re-send the file concerning Ms. Burge. (Doc. # 34-2). Thereafter, FDLE filed an administrative complaint against Ms. Burge based on the alleged misuse of law enforcement databases. (Doc. # 34-4). True, the FDLE proceedings against Ms. Burge were subsequently dismissed. But this was because an FDLE employee apparently deleted the original file, resulting in an impermissible delay in Ms. Burge's case. (Doc. # 43-3 at 188-89). This series of events, occurring long after Ms. Burge's employment ended, does not refute that Sheriff Wells had received ample evidence from which to conclude that Ms. Burge had fraternized with Mr. Bradshaw and misused databases.

Because Ms. Burge has not rebutted Sheriff Wells's proffered non-discriminatory reason for the alleged adverse employment action, Sheriff Wells is entitled to summary judgment on the Title VII claim.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendant Sheriff Rick Wells's Motion for Summary
     Judgment (Doc. # 33) is **GRANTED.**

(2)  Summary judgment is granted in favor of Sheriff Wells on
     all  counts of the complaint.

(3)  The Clerk is directed to enter judgment accordingly
     and, thereafter, **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this
<u>10th</u> day of December, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE